Filed 3/19/14  In re T.J. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re T.J. et al., Persons Coming Under the Juvenile Court Law. | |
| | D064559 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J517708A-B) |
| v. | |
| TRACY J., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Tracy J. appeals from orders terminating his parental rights to his children, T.J. and Nancy J., under Welfare and Institutions Code section 366.26. (Further statutory references are to the Welfare and Institutions Code.) Tracy contends the juvenile court erred when it determined the beneficial parent/child relationship exception did not apply and terminated parental rights. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Tracy J. is the father of T.J., who is now four years old, and Nancy J., who is almost three years old (together, the children). The children's mother, Michelle B., passed away in July 2013. On our own motion, we take judicial notice of this court's opinions in *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415; *In re Nancy J.* (Feb. 16, 2012, D060221 [nonpub. opn.]; and *Michelle B. v. Superior Court* (Apr. 19, 2013, D063054) [nonpub. opn.]. (Evid. Code, § 452, subds. (a) & (d).) The history of the children's dependency cases is detailed in those opinions. We briefly review the facts that are relevant to the issues raised in this appeal. (For brevity, and not out of any lack of respect to Michelle, we focus on Tracy and his relationships with the children in this opinion.)

T.J. and Nancy were removed from their parents' care at birth and adjudicated dependents of the juvenile court because neither parent was able to provide regular care to them. Tracy is intellectually disabled. A psychological evaluation indicated he suffered from impairments in memory, reasoning, understanding, and communicating, and would be unable to independently parent his children. The San Diego County Health and Human Services Agency (the Agency) placed T.J., and later, Nancy, with a foster

2

family that was willing to adopt the children if Tracy and Michelle were unable to reunify their family.

During the first 18 months of T.J.'s case, Tracy fully cooperated with the Agency, made substantial progress with his court-ordered case plan, and demonstrated his ability to feed, soothe, protect and care for his son. Tracy did not have any mental health or personality disorders, substance abuse problems, or any history of crime or violence. The Agency provided the parents with one three-to-four hour supervised visit a week. A visitation supervisor and other professionals involved in the case characterized Tracy's interactions with T.J. as "great," "very protective," "very loving and adoring," "protective [and] alert," and "very nurturing, very loving." Tracy was described as a "very loving, caring father" who was "very cognizant of [T.J.'s] safety." The social worker acknowledged Tracy had a basic understanding of how to care for T.J. and that he communicated extensively and played with his son, but she remained concerned that Tracy would not be able to adequately care for T.J. in an emergency. At each review hearing, the Agency asked the juvenile court to terminate reunification services, set a section 366.26 hearing, and select adoption as T.J.'s permanent plan.

In July 2011, the juvenile court terminated reunification services in T.J.'s case and set a section 366.26 hearing. (Nancy's dependency case was ongoing.) The parents challenged the juvenile court's rulings. This court held that the Agency had unreasonably limited the parents' visitation services and remanded the matter to the juvenile court with directions to expand the parents' visitation with T.J., including unsupervised visitation as

3

appropriate, commensurate with the level of visitation and other services the juvenile court had ordered in Nancy's dependency case.

Following remand in February 2012, the juvenile court implemented a new visitation plan for the family. Once a week, the parents and the children participated in a two-hour "Mommy & Me" class, followed by an unsupervised visit for approximately one hour. On Wednesdays, when Tracy's independent living skills (ILS) worker, Randlene Ostlund, helped him with independent living and parenting skills, the children stayed with the parents for approximately six hours, including one hour of unsupervised visitation. Every other week, the parents had a one-hour unsupervised visit with the children in a park at some distance from their home (park visit), which required them to make a 10-hour round-trip commute by public transportation. After regularly making the difficult commute to see their children from January through May 2012, the parents stopped attending the park visit. When the "Mommy & Me" classes ended in August, the Agency refused to make alternative arrangements to maintain the parents' second weekly visit because the parents were not taking advantage of the park visits. The parents continued to have a six-hour visit with their children once a week.

In June 2012, the Agency recommended that the juvenile court terminate the parents' reunification services and set a hearing under section 366.26. The children's pediatrician expressed concerns about the parents' ability to safely care for the children and meet their medical needs. (T.J. had severe asthma.) The parents continued to have difficulties supervising both children together. T.J. liked to run and almost ran into a street and a parking lot. Tracy put Nancy on a bed and walked away. She crawled off

4

the bed and fell on her head. The social worker reported that the parents made sure the children had enough to eat and had plenty of toys but they required significant guidance and direction to safely parent.

In November 2012, the juvenile court found that the parents made substantive progress with their case plans except in their ability to assess, and react to, emergency situations. The juvenile court found that it would be detrimental to the children to return to their parents' care, terminated reunification services, and set a section 366.26 hearing.

The section 366.26 hearing was held on June 28, July 15, August 30 and September 6, 2013. The children's court-appointed special advocate (CASA) testified that Tracy was "very playful" and "very attentive" in his interactions with the children. The children seemed excited when they arrived for visits. Tracy actively engaged the children. He climbed on the playground structure with them, introduced toys and played with them. However, Ostlund had to remind Tracy to give T.J. his asthma inhaler and also advised him to cut the children's food into smaller pieces. The CASA said the foster parents had a more parental role with the children whereas Tracy's relationship with them was more playful.

Jessika Ahlberg, an Agency adoptions social worker, observed two visits between the children and their parents. Tracy removed toys, diaper bags, backpacks, food and drinks from the car and brought them to the playground area. He "orchestrated" the visit, staying in close proximity to the children. If T.J. and Nancy split up, Tracy would stay with T.J. Tracy supervised T.J. without assistance. During one visit, Nancy laid her head on Tracy's chest. Ahlberg said the children enjoyed spending time with Tracy. They had

5

fun. Tracy displayed age-appropriate parenting skills. The children knew Tracy as their father and called him "dad" or "daddy". Ahlberg did not believe that the children had a primary parental bond with Tracy. Instead, they viewed him more like an uncle or an extended family member.

William Balliet, an Agency adoptions social worker, observed four visits between the children and their parents, and visited the children in the foster family home. In assessing the parent/child relationships between Tracy and his children, Balliet did not observe the children seeking comfort or attention from their father. By contrast, they were very talkative and engaged with their foster parents. Balliet believed that the children would benefit from having continued contact with Tracy but it was not necessary for their emotional well-being.

Dr. Yanon Volcani, Ph.D., a clinical psychologist, conducted a bonding study of the children and their parents. Before observing the children with their parents, he reviewed the social worker's reports, and interviewed Randene Ostlund and the children's foster mother to gain an understanding of the extent and nature of visitation and contact between the children and their parents. The foster mother advised him that she was willing to allow some continued contact between the children and their parents but would be reluctant to continue caring for the children under a plan of guardianship or long-term foster care.

In looking at bonding, Dr. Volcani evaluated the frequency and manner in which the child sought contact with the parent. He said Tracy was an adoring, engaged, embracing and "childcentric" father. Tracy was enormously playful and resonative. He

6

was extremely adept at engaging with the children at their level. Tracy related to T.J. and Nancy in a manner supportive of their emotional security with competence and confidence. The children demonstrated significant attachments to their father. T.J. had a clear understanding of the difference between his foster father and his own father.

Although T.J. and Nancy were "adoringly interactive" with their parents, Dr. Volcani concluded that the children identified their foster parents as their primary caregivers. T.J. identified his foster mother as the person he wanted to tuck him in bed at night, read him a story, cook him dinner and feed him, bathe him, get him up in the morning, feed him breakfast, help him get ready for the day, take care of him if he were sick, and be with him if he were scared. He identified his foster father as the person he wanted to take care of him if he were physically hurt and help fix a broken toy.

Dr. Volcani said if T.J. were not to see his father, his relationship with his foster parents would buffer him from obvious and overt symptomology such as clinical depression, but would not protect him from the loss of the person he knew as his father. In some cases, such a loss could disrupt a child's development and lead to increased incidents of behavioral and relational difficulties, and substance abuse. However, the children also needed security and stability, which might preclude a plan of long-term guardianship.

Randene Ostlund provided independent living skills and parenting instruction to persons with developmental disabilities. She worked with Tracy 40 hours a month. His visits with the children occurred while she was present. Ostlund spent approximately 1000 to 1200 hours with Tracy and the children in the last two-and-a-half years. The

7

children were always happy to see their father. Their happiness was evident from the way they greeted him, the expressions on their faces and their body language. Tracy was well bonded with his children and his children had formed a strong attachment to him. Sometimes Nancy preferred her foster mother.

The juvenile court said the starting point for his analysis was that Tracy, despite his efforts and attention to his children, did not have the intrinsic ability to parent them. The juvenile court found that Tracy maintained regular visitation and contact with his children, stating, "I would also even conclude that the child[ren] would, in fact, benefit from continuing that relationship. I'm not going to deny that, it's a true fact, but we get down to what I feel are the important words of the exception: Are there compelling reasons that termination would be detrimental to the child because of that bond?"

In concluding that termination of parental rights would not be detrimental to the children within the meaning of the parent/child relationship exception, the juvenile court found that the children had a deep bond with the current caregivers. They had been in the foster parents' care since they were infants. Tracy required supportive services to manage his daily life and support his role as a father. The court terminated parental rights and designated the foster parents as the children's prospective adoptive parents.

DISCUSSION

A

Tracy contends he has developed and nurtured beneficial relationships with his children despite his disabilities and the Agency's improper limitations on his visitation. He argues the evidence clearly establishes that his children have a significant bond to him

8

and would suffer serious harm if the parent/child relationships were terminated. Tracy contends the relationships between him and his children are similar to the parent/child relationship in *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*), in which this court reversed the order terminating parental rights.

The Agency points out that this court has confined *S.B.* to its extraordinary facts. (*In re C.F.* (2011) 193 Cal.App.4th 549, 558-559 (*C.F.*). It argues this case is not similar to *S.B.* because, unlike the parent in *S.B.*, Tracy suffered from developmental disabilities, which impacted his ability to adequately parent his children.

B

At a permanency plan hearing under section 366.26, the court may order one of three alternatives—adoption, guardianship or long-term foster care. (*In re S.B.*, *supra*, 164 Cal.App.4th at pp. 296-297.) There is a strong preference for adoption over the alternative permanency plans. (*Id*. at p. 297; *San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 888.) "In dependency proceedings, an order terminating parental rights is not only conclusive and binding upon the birth parents, but also effectuates a complete and final legal termination of the parental relationship. [Citations.] The parent-child relationship enjoys no legal recognition after termination of parental rights. [Citations.]" (*In re C.B.* (2010) 190 Cal.App.4th 102, 128.)

Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." In this context, " 'benefit' " means that the parent-child relationship "promotes the well-being of the child

9

to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) "The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent. (*Ibid*.) To prove the exception, a parent is not required to show that the child has a primary attachment to the parent or that the parent has maintained day-to-day contact with the child. (*S.B.*, *supra*, 164 Cal.App.4th at p. 299.)

We determine whether there is substantial evidence to support the court's ruling by reviewing the evidence most favorably to the prevailing party, and indulging in all legitimate and reasonable inferences to uphold the court's ruling. (*S.B.*, *supra*, 164 Cal.App.4th at pp. 297-298; *In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

C

Throughout the children's dependency proceedings, Tracy complied with every aspect of his reunification case plans, regularly visited the children, and developed relationships with them that were mutually affectionate and loving. Tracy's disability did not diminish his love for his children, it focused it. The juvenile court found that the children would benefit from continuing their relationship with their father, but would not be seriously harmed by termination of parental rights because they had deep bonds with their current caregivers.

10

While Tracy was no doubt as devoted to his children as the father in *S.B.* was to his child, the record here supports a finding that continuation of the parent/child relationship does not outweigh the benefit the children would gain from being adopted by the family that has cared for them since infancy. (*S.B.*, *supra*, 164 Cal.App.4th at p. 298.) T.J. was placed with the foster parents when he was two months old. He is now four years old. Nancy has lived with the foster parents since she was two days old. She is almost three. They have known no other home. The foster parents have been the children's sole caregivers. They know them as "mommy" and "daddy". During Dr. Volcani's bonding study, T.J. chose his foster mother as the person he most wanted to tuck him in bed, read him a story, cook him dinner and feed him, bathe him, get him up in the morning, feed him breakfast, help him get ready for the day, take care of him if he were sick, and be with him if he were scared. The juvenile court could reasonably conclude that a plan of guardianship or long-term foster care could result in the children being removed from the only home they have ever known, with devastating consequences to the children's well-being.

In Tracy, the children have a father who has given them a full measure of his love, devotion, attention and affection. The children's foster parents have given them no less. In addition, the foster parents have provided a safe, stable home to the children, met their needs for comfort, nourishment, guidance and appropriate care, and can offer them a permanent home. In view of the children's young ages, their needs for security and stability with a competent caregiver are paramount. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) The foster parents have existing bonded relationships with the

11

children that are parental in nature.  They have the ability to make independent decisions concerning the children's long-term interests in education, medical care and appropriate relationships.  We conclude there is substantial evidence to support the juvenile court's finding the beneficial parent/child relationship exception did not apply.  (§ 366.26, subd. (c)(1)(B)(i).)

## DISPOSITION

The orders terminating parental rights are affirmed.

---

McINTYRE, J.

WE CONCUR:

---

McCONNELL, P. J.

---

BENKE, J.